# UNITED STATES DISTRICT COURT

for the

Southern District of California ▾

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Apple, Inc., One Infinite Loop, Cupertino, CA, 95014<br>908-884-0228 ; kairygil@yahoo.com ;<br>Kairy Stephania Quinonez | )<br>)<br>)<br>)<br>)<br>) |

Case No.    25-mj-02590-SBC

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C., Sec. 1324, 18 U.S.C. Sec. 371 | Bringing in aliens for fiancial gain and conspiracy |
| 18 U.S.C. Sec. 201 | Receipt of bribes by a public official |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Aurora Rodriguez*
_____
*Applicant's signature*

HSI SA Aurora Rodriguez
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: _____05/13/2025_____

*Judge's signature*

City and state: San Diego, California

Hon. Steve B. Chu, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Infinite Loop, Cupertino, California, 95014.

## ATTACHMENT B

I.    Service of Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.    Items Subject to Seizure from the ISP

A.  All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for:

**908-884-0228**
**kairygil@yahoo.com**
**Kairy Stephania Quinonez**

B.  The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the Homeland Security Investigations and Department of Homeland Security Office of Inspector General as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of Title 18, U.S.C. § 371 and Title 8, U.S.C. § 1324(a)(2)(B)(ii); Title 8, U.S.C. § 1324(a)(2)(B)(ii); and Title 18, U.S.C. § 201(b)(2)(C) for the period of February 2, 2025, up to and including May 2, 2025, and to seizure of:

A.  Communications, records, attachments, files, and data tending to discuss or suggest efforts to facilitate the smuggling of undocumented aliens from Mexico into the United States;

B.  Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses,

IP addresses, and phone numbers–used to facilitate the smuggling of undocumented aliens from Mexico into the United States;

C. Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in the smuggling of undocumented aliens from Mexico into the United States;

D. Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the smuggling of undocumented aliens from Mexico into the United States, such as stash houses, load houses, or delivery points; and

E. Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities in II.B(A)-(D) above;

F. Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain, and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.**

# AFFIDAVIT

I, Special Agent Aurora Rodriguez, being duly sworn, hereby state as follows:

## INTRODUCTION

1.     I submit this affidavit in support of applications for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple Inc. ("Apple") to disclose to the government records and other information, including the contents of communications, for the **Target Account** associated with identifiers: telephone number 908-884-0228, email address kairygil@yahoo.com, and name Kairy Stephania Quinonez, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B and relates to the investigation and prosecution of Kairy Stephania QUINONEZ ("Defendant") concerning violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain, and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.

2.     I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed since August of 2021. I am currently assigned to the San Diego Field Office as a Task Force Agent (TFA) with the Department of Homeland Security (DHS) Office of Inspector General (OIG). I am assigned to investigate criminal organizations that are associated to border corruption, including bribery, drug trafficking, and human smuggling. Before my employment as a Special Agent with HSI, I was a Customs and Border Protection Officer (CBPO) for three years.

3.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California, as well as human smuggling into and through this District. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking and

human smuggling investigations, I have knowledge of the operational habits of narcotics traffickers and human smugglers.

4.    During my tenure as a CBPO, I was responsible for inspecting travelers and vehicles to ensure compliance with, among other things, customs, immigration, and agricultural laws and regulations, as well as detecting and preventing illegal activities like terrorism, smuggling, human trafficking, drug trafficking, and illegal migration while simultaneously facilitating the flow of legitimate trade and travel. I also participated in the investigation of cases involving the smuggling of aliens from Mexico into the United States.

5.    I have participated in investigations involving the use of cellular devices to coordinate and communicate aspects of corrupt activity and sharing sensitive information pertaining to law enforcement. I have experience in interviewing confidential informants, witnesses, targets under investigation, executing arrest/residential warrants, conducting surveillance, and other variety of investigative techniques. I have worked and consulted with numerous federal agents who have investigated border corruption, narcotics trafficking, and human smuggling throughout the United States.

6.    Through the course of my training, experience, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers, in particular those who attempt to smuggle aliens into the United States from Mexico. I am aware that it is a common practice for illicit alien smugglers to work in concert with other individuals and to do so by using cellular telephones. Because they are mobile, the use of cellular telephones permits illicit alien smugglers to easily carry out various tasks related to their smuggling activities, including, for example, remotely monitoring the progress of aliens while in transit, providing instructions to smugglers, warning accomplices about law enforcement activity, discussing with co-conspirators the payments of money in exchange for acts in furtherance of the conspiracy, and communicating with co-conspirators who are transporting aliens and/or proceeds from alien smuggling.

7.    In In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of alien smuggling organizations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in the affidavit. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.    Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii), Title 8 U.S.C. § 1324(a)(2)(B)(ii), and Title 18 U.S.C. § 201(b)(2)(C), as described in Attachment B.

**JURISDICTION**

8.    This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**FACTS SUPPORTING PROBABLE CAUSE**

9.    Beginning in September 2024, OIG identified several reactive alien-smuggling defendants that each asserted that he had been directed to cross through the San Ysidro Port of Entry (POE) through a particular lane during a particular hour-long period. This was because, they stated (or at least alluded to), the group they were working with had a United States Customs and Border Protection Officer (CBPO) working for them.

10.    Based on review of those defendants' crossing histories, telephone evidence, and other material, both Farlis ALMONTE and Ricardo RODRIGUEZ were identified as corrupt CBPOs working for this group. Subsequent review of other crossing records reflected that both ALMONTE and RODRIGUEZ often admitted into the country several other cars with multiple visible passengers, but they documented that only the driver was in the car.

11.    ALMONTE and RODRIGUEZ were later arrested on March 24, 2025, and charged by complaint, and then information, for conspiring to bring in aliens for financial

gain, substantive counts for bringing in aliens for financial gain, and receipt of bribes by a public official. *See* 25-CR-1321. During his post-arrest interview, RODRIGUEZ admitted to the conduct and described, for example, how he would share his lane assignments with his coordinator and admit alien-laden vehicles into the United States for money. RODRIGUEZ also implicated QUINONEZ as being involved in the smuggling, too.

12.    Further investigation, including review of evidence from RODRIGUEZ's cell phone and POE records like videos, photographs, and TECS records, shows that QUINONEZ was involved with at least four alien smuggling events beginning on March 2, 2025.

13.    Based on the information described in this Affidavit, I request account data for the **Target Account** for the period beginning on February 2, 2025, one month before QUINONEZ first admitted an alien-laden motorcycle into the United States without meaningful inspection, up to and including May 2, 2025, the day QUINONEZ was arrested.

### *Events Leading to Arrests of ALMONTE and RODRIGUEZ*

Evidence of ALMONTE and RODRIGUEZ conspiring with others to bring in aliens for financial gain—that led to their arrests in late March—is presented here as a function of three reactive arrests at the POE, including statements by those defendants and phone evidence, as well as other abnormal events at the POE and abnormal cash deposit activity.

### *Arrest of REACTIVE DEFENDANT #1*

14.    At about 2:30 a.m. on September 5, 2024, REACTIVE DEFENDANT #1 drove into the United States through lane 5 at the POE as the sole visible occupant of his white BMW. CBPO Quach was assigned to the lane, and after a cursory inspection, he found two people hiding under a blanket in the rear. The pair were later determined to be aliens without documents allowing them to enter or remain in the United States.

15.    In his post-arrest statement, REACTIVE DEFENDANT #1 admitted to the smuggling, adding that a person was to pay him $7,000 for it. That person, REACTIVE DEFENDANT #1 added, told him to cross through lane 5 between 2:00 a.m. and 3:00 a.m. and that a black male officer, who the group already paid, would be working the lane. But

when REACTIVE DEFENDANT #1 approached the lane, an Asian officer was working the lane instead. (ALMONTE appears to be of Dominican descent.)

16.    Evidence recovered from REACTIVE DEFENDANT #1's phone corroborated his statements. In a screenshot of a WhatsApp message thread with what appears to be his smuggling coordinator, the coordinator explained to REACTIVE DEFENDANT #1 that "It's two that are working … with me" and that one was "coming to Tijuana after getting off work" so he could "introduce" REACTIVE DEFENDANT #1 to him. In a separate screenshot of a WhatsApp message thread between a contact saved as "Farli Usa" (ALMONTE's first name is "Farlis") with an unidentified party (believed to his coordinator), "Farli Usa" explained that he "did not get more shifts" but discussed his upcoming shift from 2:00 p.m. to 10:00 p.m., adding that he saw the "driver" who was wearing a hat and driving a white BMW. (During REACTIVE DEFENDANT #1's relevant crossings, he drove his white BMW while wearing a hat.)

17.    REACTIVE DEFENDANT #1 otherwise had three relevant other crossings into the United States: August 17, 2024, through RODRIGUEZ's lane, August 24, 2024, through ALMONTE's lane, and again on August 29, 2024, through RODRIGUEZ's lane. REACTIVE DEFENDANT #1 has identified each of these dates as dates when he was illegally crossing aliens.

18.    About 90 minutes after REACTIVE DEFENDANT #1 was detained on September 5, ALMONTE, working a different primary booth at the POE, queried REACTIVE DEFENDANT #1, his car, and the smuggled persons through a CBP system documenting several pieces of information, including seizure data. Because REACTIVE DEFENDANT #1 was not seeking admission through ALMONTE's lane at the time, ALMONTE appeared to have no legitimate reason to make those queries.

*Arrest of REACTIVE DEFENDANT #2*

19.    At about 12:30 p.m. on September 25, 2024, REACTIVE DEFENDANT #2 drove into the United States through lane 17 at the POE with only an adult female passenger visible. But at the primary booth, REACTIVE DEFENDANT #2 provided his ID and only a

male's ID on behalf of his passenger. The CBPO noticed this discrepancy and detained them. The adult female then alerted the CBPO to her two kids hidden in the rear of the car. All three were later determined to be aliens without documents allowing them to enter or remain in the United States.

20.    Post-arrest, REACTIVE DEFENDANT #2 admitted to the smuggling in exchange for $3,000, adding he was told by his recruiter that the group was working with a CBPO at the POE. Evidence recovered from REACTIVE DEFENDANT #2's phone showed that, approximately 45 minutes before he entered the country, REACTIVE DEFENDANT #2 was directed to enter lane 16 at the POE: The other party told him that "You already know 16" and to "Erase everything."

21.    But when REACTIVE DEFENDANT #2 entered the POE, he entered through lane 17. ALMONTE, meanwhile, was manning the primary booth at lane 16 at the time. Two days after REACTIVE DEFENDANT #2 was arrested, ALMONTE queried the same CBP system for both REACTIVE DEFENDANT #2 and the car he was driving, again without any apparent legitimate purpose.

### Arrest of REACTIVE DEFENDANT #3

22.    At about 9:30 p.m. on December 6, 2024, REACTIVE DEFENDANT #3 entered the United States through the POE in a car with four other people. While lined up to enter through lane 16 (ALMONTE was manning that primary booth at the time), a CBPO in pre-primary approached the car and, when presented with IDs for the occupants, noticed that the documents did not appear to have been issued to the passengers. Those four were later determined to be aliens without documents allowing them to enter or remain in the United States, and REACTIVE DEFENDANT #3 was arrested.

23.    During his post-arrest statement, REACTIVE DEFENDANT #3 admitted to the smuggling, stating that he was to be paid $1,000 and was told to go through lane 16 that day because the group had a CBPO at the POE working for them. REACTIVE DEFENDANT #3 also admitted to smuggling on behalf of the group earlier, too.

24. Subsequent review of REACTIVE DEFENDANT #3's earlier crossings showed that he often entered the POE through lanes manned by ALMONTE or RODRIGUEZ. In those crossings, despite having at least one other visible occupant in the car, ALMONTE or RODRIGUEZ documented in crossing records that only the driver was present. For example, TECS records show that on October 15, 2024, REACTIVE DEFENDANT #3 entered the POE through lane 15, manned by RODRIGUEZ. A passenger is clearly visible seated next to REACTIVE DEFENDANT #3, but RODRIGUEZ entered only REACTIVE DEFENDANT #3's information into TECS. Similarly on November 12, 2024, REACTIVE DEFENDANT #3 entered the POE through lane 17, again manned by RODRIGUEZ. Several passengers are clearly visible in the car, but RODRIGUEZ again entered only REACTIVE DEFENDANT #3's information into TECS.

25. Then on November 28, 2024, REACTIVE DEFENDANT #3's car was lined up to enter the POE through lane 14. Despite being relatively close to that primary booth, the car then reversed out of that lane, forcing two other cars to reverse out of the way, before maneuvering to line up for lane 15, manned by RODRIGUEZ.

26. Again, several people (at least three) can be seen in the car along with REACTIVE DEFENDANT #3 when he entered the country. But RODRIGUEZ entered only REACTIVE DEFENDANT #3's information into TECS. REACTIVE DEFENDANT #3 has admitted that he was smuggling aliens on that date.

***ALMONTE Allows Entry of Car with TECS Alert Without Sending to Secondary***

27. On December 6, 2024, a white Honda sedan with an active TECS alert on its license plate entered the POE through lane 16, manned by ALMONTE. The TECS alert generated a mandatory referral to secondary inspection of the car. But ALMONTE instead allowed the car to enter the United States without going to secondary inspection.

28. Shortly thereafter, ALMONTE contacted the vehicle secondary lot supervisor and asserted that he (ALMONTE) had received a "system error" on his primary terminal regarding the license plate of a white car. ALMONTE added that there was not a white car at his booth when the alert populated, asserting instead that there was only a blue car present and that it was

not the same car that generated the TECS alert.

29.     But TECS records show otherwise. The white sedan with the license plate tied to the TECS alert can be seen in photographs as it approached ALMONTE's booth at the time. ALMONTE otherwise inputted only an "unknown" number of passengers in the car for the vehicle encounter.

30.     Review of records show that this car had five prior crossings into the United States between late October 2024 and early December. Each prior crossing was processed either by ALMONTE or RODRIGUEZ, and each was suspicious: Photographs show that the driver, who appeared to be young, presented an ID for a 62-year-old man as his own, and that multiple occupants were visible in the car but only the driver was inputted into TECS.

***Cash Deposit Activity***

31.     Both ALMONTE and RODRIGUEZ, in bank accounts they maintain, deposited abnormal amounts of cash in the latter half of 2024.

32.     In the year-and-a-half period before mid-August 2024, ALMONTE appeared to deposit only about $1,600 in cash into his account through about five transactions. No deposit exceeded $700. But beginning in late August 2024 and through late November 2024 (a three-month period), he appeared to deposit almost $22,000 in cash into his account broken out into small deposits. And some of those deposits—like on September 26 and November 17—were made on the same day.

33.     Similarly, while RODRIGUEZ had no cash deposits to his account between January 2023 and early May 2024, beginning on May 11, 2024, and through late November (a six-month period), he appeared to deposit almost $24,000 into his account, also broken out into small deposits.

34.     In my training and experience and conversations with other officers, I am aware that corrupt officers often get paid in cash and then deposit the criminal proceeds in smaller amounts and sometimes across several bank accounts.

***Arrests of ALMONTE and RODRIGUEZ***

35.     On March 24, 2025, law enforcement arrested ALMONTE and RODRIGUEZ

for bringing in aliens for financial gain, conspiracy, and receipt of bribes by a public official. During his post-arrest statement, RODRIGUEZ admitted to working with an alien smuggling organization to facilitate the entry of aliens into the United States through the primary lanes he was working at the POE. He added, for example, that he would share with his co-conspirators his lane assignments and that his co-conspirators would then send him information about the alien-laden cars that were going to enter through his lane. And in exchange for doing this, RODRIGUEZ added, he was paid thousands of dollars per car.

36.    RODRIGUEZ then added that, after he had resigned from CBP in late January 2025, he had recruited another CBPO, QUINONEZ, to similarly allow undocumented aliens into the United States through the lane she was assigned to on behalf of the organization. QUINONEZ, he added, was his former roommate before he resigned from CBP. RODRIGUEZ added that QUINONEZ first agreed to help smuggle aliens on behalf of the organization around March 2, 2025.

37.    Evidence from RODRIGUEZ's cell phone, along with evidence from the POE like video, photographs, and TECS records, show that QUINONEZ appeared to help with at least four alien smuggling events at the POE in March 2025.

***Two Smuggling Events on March 2, 2025***

38.    The afternoon of March 2, 2025, POE video shows that a motorcycle arrived to the primary booth manned by QUINONEZ, with two people. But upon arrival, audio from the booth reflects that one of the persons called out "five seven" (in Spanish) to QUINONEZ and handed her documents. QUINONEZ then failed to scan or enter the documents into TECS, the motorcycle's license plate was not entered into the system, and she manually canceled the crossing package.

39.    And just a few minutes earlier, just behind the motorcycle in QUINONEZ's lane, a human narcotics detection dog alerted to a pickup truck that had eight aliens hidden in the bed. The driver of that truck, a Mexican citizen without crossing privileges, had a BCC card on him issued to another person. TECS records show that this BCC card was used in at least one earlier alien smuggling event that ALMONTE processed at the POE.

Other records from a WhatsApp PRTT concerning a number used by one of the coordinators identified by the earlier reactive defendants indicate that, shortly before the driver of this truck entered the POE, he began to share his live location with that coordinator. And about a half hour after QUINONEZ's shift on the primary lane ended, she messaged RODRIGUEZ (from a number subscribed to her), appearing to reference that smuggling event when she wrote "PPK 1045," believed to be referring to a pre-primary K-9 alert for alien smuggling.

40.     The next day, RODRIGUEZ messaged QUINONEZ again, appearing to discuss the smuggling group wanting to work with her more. He first told her that, "I talked to them. They are desperate" to which QUINONEZ replied, "Who? Bro. Telephone," appearing to suggest that the pair instead talk only on a phone call instead of text messaging. RODRIGUEZ then told her that "I told them that they need you. You don't need them."

***Two Smuggling Events on March 16, 2025***

41.     About 15 minutes before QUINONEZ's first shift on the primary lane on March 16, RODRIGUEZ messaged with his girlfriend (at a number RODRIGUEZ indicated belonged to her), appearing to discuss the same keyword "five seven" that the smugglers were to use. His girlfriend asked RODRIGUEZ, "What keyword should they use or what" and that "Chuy said he/she told him 57." RODRIGUEZ then confirmed, "Yes, 57" and his girlfriend confirmed that "they are going to take off then." (On March 2, one of the persons on the motorcycle crossing through QUINONEZ's lane, as described above, called out to QUINONEZ "five seven.") The pair then continued to talk about "Chuy heading over there."

42.     While RODRIGUEZ and his girlfriend continued to message each other, a motorcycle with two people on it entered QUINONEZ's lane at 5:35 p.m. QUINONEZ again did not document either traveler into TECS, did not enter the license plate into the system, and manually canceled the package.

43.     An hour later, his girlfriend messaged RODRIGUEZ, asking "Did Kairy call

you already?" (QUINONEZ's first name is Kairy.) RODRIGUEZ then told his girlfriend to "send them with the passport cards" and that "Kairy prefers them that way" and to "explain to them well how to do it." His girlfriend replied that "Yes, those are the same ones that Chuy and the guy used to cross." Around 7:15 p.m., RODRIGUEZ stated in a voice message that he was "going to head down to wait for the other one to cross." His girlfriend then asked whether "they should just show them [believed to be a reference to admission documents] with the picture inside the envelope showing just a portion of the card?"

44.   Then at about 7:35 p.m., another motorcycle entered the POE through QUINONEZ's lane with two people on it. QUINONEZ again failed to scan their documents for admission, did not enter the motorcycle's license plate into TECS, and did not generate a crossing package for the motorcycle. (The LPR otherwise appeared to have failed to recognize the license plate in the first instance.) Three hours later, RODRIGUEZ's girlfriend messaged RODRIGUEZ that the "guy we brought across posted a picture over there already hahahaha" to which RODRIGUEZ replied with a laughing emoji.

45.   Two weeks later, RODRIGUEZ and his girlfriend continued to message with each other, discussing the coordinator in Mexico, QUINONEZ, and ALMONTE. RODRIGUEZ first messaged that ALMONTE had called him the night before and that ALMONTE was out drinking with the coordinator. His girlfriend then confirmed ALMONTE's number with RODRIGUEZ before asking, "Does Farly know that Kairy works here," believed to be a reference to the smuggling organization. RODRIGUEZ replied, "Who knows" and that he was "not sure" whether he told him [believed to be a reference to ALMONTE] about it."

***Arrest of QUINONEZ***

46.   On May 1, 2025, a federal grand jury returned an indictment charging, among others, QUINONEZ with conspiracy to bring in aliens for financial gain, in violation of Title 18, U.S.C., § 371 and Title 8, U.S.C., § 1324(a)(2)(B)(ii), as well as three substantive counts for bringing in aliens for financial gain, in violation of Title 8, U.S.C.,

§ 1324(a)(2)(B)(ii).

47. The morning of May 2, 2025, law enforcement arrested QUINONEZ at the POE on the related arrest warrant. Just before QUINONEZ was arrested, she was holding an Apple iPhone that she later confirmed as being hers. She also later stated that her cellular number was 908-884-0228 and CBP records otherwise indicate that her email address is kairygil@yahoo.com (both associated with the **Target Account**).

48. On or about March 26, 2025, law enforcement requested that Apple preserve the iCloud data associated with the **Target Account**. Apple then confirmed that the data was being preserved.

49. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that the **Target Account** is being used to coordinate and facilitate the smuggling of aliens into the United States. Unless disabled by a sophisticated user, iCloud accounts are automatically created and information automatically backed up. If the user of the account is using an Apple device like an iPhone (like here), device information will be automatically backed up to their iCloud account. In my training and experience, alien smugglers commonly use cellphones in furtherance of their activities because, among other reasons:

  a. Cellphones are mobile and permit instant access to phone calls, text messages, web pages, and voice messages;

  b. Cellphones permit real-time, active monitoring of the smuggled aliens while they are in transit;

  c. Cellphones can be used to easily communicate, arrange, and synchronize the times and locations for pick up and drop off of smuggled aliens;

  d. Cellphones can be used to communicate using encrypted messaging applications so as to hinder law enforcement monitoring.

Given that Apple confirmed that available data for the **Target Account** was being preserved, it is likely that the subscriber or user of the **Target Account** utilizes the iCloud

file hosting service to backup data from her Apple cellphone. As described in the paragraphs below, the iCloud service can be used to backup and store data from iOS devices, third-party applications, photos, videos, documents, and other electronic data.

50.     Subscriber and/or user information, including: all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, and transactional data will lead to the identification of co-conspirators and other evidence of alien smuggling. Such information is likely to be stored in the **Target Account**. I further believe that evidence of alien smuggling (such as text messages, photos, videos, locations, and contacts) may be stored in the **Target Account**. In my training and experience, alien smugglers may be involved in the planning and coordination of alien smuggling events in the days and weeks prior to such an event. Given the facts described above, I request account data for the **Target Account** for the period beginning on February 2, 2025, one month before QUINONEZ first admitted an alien-laden motorcycle into the United States without meaningful inspection, up to and including May 2, 2025, the day QUINONEZ was arrested.

51.     Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

## INFORMATION REGARDING APPLE ID AND iCLOUD

52.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

53.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.    iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.    iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

54.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

55.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

56.    Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the

types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

57.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

58.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

59.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers

controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

60.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

61.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

62.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber

information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

63.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

64.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

65.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

66.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other

information (including the content of communications and stored data) particularly described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

67.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.   The ISP's personnel are not.  It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises.  The impact on its business would be disruptive and severe.

68.    Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure.  Those copies will be provided to me or to an authorized federal agent.  The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

69.    Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software.  It may also be time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or

typographical errors.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches.  Keywords search text.  Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text.  Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

70.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.   Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

71.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

72.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

73.    Based on the foregoing, I request that the Court issue the proposed search warrant.

74.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is

1  not required for the service or execution of this warrant.

2

3

4  I swear the foregoing is true and correct to the best of my knowledge and belief.

5

6  _____
   *Aurora Rodriguez*

7  Special Agent Aurora Rodriguez
   Homeland Security Investigations

8  Sworn and attested to under oath by telephone, in accordance with Federal Rule of

9  Criminal Procedure 4.1, this 13th day of May 2025.

10

11  _____

12  HONORABLE STEVE B. CHU
    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28